## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

WILLIAM ROBINSON,        )
                           )
     Plaintiff,          )
                           )
v.                       )     Civil Action No. 3:18CV117–HEH
                           )
J. FENNER, *et al.*,        )
                           )
     Defendants.       )

### MEMORANDUM OPINION
**(Granting Defendants' Motion for Summary Judgment)**

William Robinson, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action[1] alleging that his rights were violated while he was a pretrial detainee at the Prince William-Manassas Regional Adult Detention Center (the "ADC"). (ECF No. 39.) In Claim One (a), Robinson alleges that Officer Fenner used excessive force and assaulted him. (*Id.* at 1.)[2] In Claim Three (b), Robinson alleges that Captain Hurlock subjected him to "cruel and unusual punishment." (*Id.* at 2.)[3]

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the punctuation, spelling, and capitalization and omits the emphasis in quotations from the parties' submissions.

[3] The Court dismissed the remainder of Robinson's claims by Memorandum Opinion and Order, dated February 20, 2020. (*See* ECF Nos. 54, 55.)

This matter is before the Court on the Motion for Summary Judgment jointly filed by Officer Fenner and Captain Hurlock. (ECF No. 57.) Robinson has responded. (ECF No. 59.) Defendants have filed a Reply. (ECF No. 61.) For the reasons stated below, the Motion for Summary Judgment will be granted.

## I. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "*scintilla* of evidence" will not preclude summary judgment. *Anderson*, 477 U.S.

2

at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).

"[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)).

In support of their Motion for Summary Judgment, Defendants have submitted: (1) an affidavit from Captain Hurlock ("Hurlock Affidavit," ECF No. 58-2); (2) two affidavits from Officer Fenner ("Fenner Affidavit," ECF No. 58-1; "Second Fenner Affidavit," ECF No. 62); (3) a copy of the Standard Operating Procedures for the ADC (ECF No. 58-3); (4) a copy of a "Use of Force Report," dated August 30, 2017 (ECF No. 58-4, at 1); (5) a copy of an "Incident Summary," dated August 31, 2017 (*id.* at 2–3); and, (6) various pictures of Robinson's face and arms (*id.* at 4–6).

Robinson has submitted his own sworn statement in opposition Defendant's Motion for Summary Judgment.[4] ("Robinson Decl.," ECF No. 59, at 10–13.) At this stage, the Court is tasked with assessing whether Robinson "has proffered sufficient

---

[4] Robinson styled his submission as an "affidavit." (ECF No. 59 at 10.) However, Defendants have pointed out a number of issues with naming it as such. (ECF No. 61 at 3.) Notably, the notary public is unidentifiable. (ECF No. 59 at 13.) The individual's signature is illegible and unaccompanied by a printed name or commission number. (*Id.*) Moreover, the document does not contain a notary stamp or seal. (*Id.*) Nevertheless, Robinson does state "under the penalty of perjury" that all of the statements contained therein are true. (*Id.* at 10.) As such, the Court will accept the submission as a declaration.

proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).

The facts offered by an affidavit or sworn declaration must also be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, the sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted). The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting a summary judgment analysis. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 945 n.9 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted).

Robinson makes a number of statements that are of no value in assessing the propriety of summary judgment. Indeed, Robinson's affidavit is comprised primarily of hearsay and conclusory statements. Most notably, Robinson alleges that Officer Fenner "assaulted [him] . . . causing . . . an injury . . . sciatic nerve damage." (Robinson Decl. ¶ 6.) This statement is a conclusory assertion that fails to create a material dispute of fact. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks and alterations omitted) (citations omitted) ("Airy generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment.").

4

Moreover, Robinson's allegation that the purported "assault" caused his putative sciatic nerve damage is both conclusory and based on hearsay. As an initial matter, Robinson fails to direct the Court to any admissible evidence to show when exactly the putative damage may have occurred. Indeed, Robinson does not even submit admissible evidence to show that he did not have sciatic nerve damage prior to his encounter with Officer Fenner. Further, Robinson seems to concede that he "didn't complain of sciatic nerve damage until months" after the encounter with Officer Fenner. (Robinson Decl. ¶ 7.) This, of course, casts doubt on the possibility of there being a causal relationship between the two occurrences. However, the issue of causation only becomes relevant if Robinson first submits admissible evidence of injury.

Robinson's statement that he has sciatic nerve damage is clearly based on what someone told him. (*See* Robinson Decl. ¶¶ 7–8.) Given Robinson's failure to introduce medical records to substantiate this claim, or any other evidence that might fall into an exception to the hearsay rule, this statement is clearly inadmissible hearsay. Moreover, Robinson is not competent to testify about the cause of a medical condition, as he is not a medical expert. *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001); *cf. Raynor v. Pugh*, 817 F.3d 123, 131 (4th Cir. 2016) (Keenan J., concurring) (explaining that a layperson's interpretation of medical tests or "speculation regarding the causes" of a condition "constitute conclusory and inadmissible lay opinion").

Finally, Robinson purports to make representations as to why it is that he believes Officer Fenner "assaulted [him]." (Robinson Decl. ¶ 15.) Specifically, Robinson alleges that Officer Fenner was seeking "retaliation" because Robinson had previously "wrote a

grievance on him." (*Id.*)  However, Robinson has again utterly failed to provide any details concerning his prior course of dealing with Officer Fenner, which would substantiate such a connection.  Robinson has failed to indicate what the grievance was, much less show that it had any merit whatsoever.  Indeed, Robinson has failed to demonstrate that Officer Fenner was even aware of the fact that such a grievance may have existed.  Given Robinson's failure to point to anything other than his own speculation to substantiate his allegations as to what Officer Fenner may have been thinking, this portion of Robinson's Declaration is also inadmissible, as it is conclusory, and Robinson has failed to establish a basis for personal knowledge.  *See Roane*, 378 F.3d at 400–01; *see also Clay Printing Co.*, 955 F.2d at 945 n.9 (citation omitted); Fed. R. Civ. P. 56(c)(4).

In light of the foregoing submissions and principles, the following facts are established for the purposes of the motion for summary judgment.  All permissible inferences are drawn in favor of Robinson.

## II.  Summary of Undisputed Facts

Officer Fenner is a "jail officer" at the ADC.  (Fenner Aff. ¶ 1.)  On August 30, 2017, Officer Fenner woke up the inmates as usual.  (*Id.* ¶ 3.)  Robinson became agitated because Officer Fenner would not turn the television on until the inmates made their beds.  (*Id.* ¶¶ 4–5.)

That evening, as Officer Fenner was inspecting the cellblock, he noticed "excess blankets in Robinson's cell."  (*Id.* ¶ 6; Second Fenner Aff. ¶ 3.)  Officer Fenner asked

6

Robinson and his cellmate who the blankets belonged to, and neither responded. (Fenner Aff. ¶ 6.)

Officer Fenner bent down to pick up the blankets. (*Id.* ¶ 7.) As Officer Fenner was standing up, "Robinson charged and grabbed [him] by the shirt and tried to wrestle [him] to the ground." (*Id.*) Officer Fenner tried to "regain control of the situation" and "grabbed Robinson around the waist." (*Id.*) "During the struggle, [Officer Fenner and Robinson] ended up in the back of the cell." (*Id.*) "Robinson began swinging his fists at [Officer Fenner]." (*Id.* ¶ 8.) However, Robinson did not actually "hit, push[], or kick[]" Officer Fenner." (Robinson Decl. ¶ 13.)

Officer Fenner "asked [Robinson] to stop." (Fenner Aff. ¶ 8.) "Robinson refused to stop resisting." (*Id.* ¶ 9.) Officer Fenner "grabbed [Robinson's] left arm [and] placed it into a 'bent wrist' behind his back and placed him against the wall." (*Id.*) Robinson "continued to resist [and] push[ed] himself off the wall." (*Id.*) Robinson's "forehead hit the wall." (*Id.*) Officer Fenner handcuffed Robinson. (*Id.*) Officer Fenner never struck Robinson. (*Id.* ¶ 10.) Robinson had "two minor injuries" on his arm and head. (Robinson Decl. ¶ 5.) Robinson is a larger person physically than Officer Fenner. (Fenner Aff. ¶ 14.)

Captain Hurlock is the Director of Security at the ADC. (Hurlock Aff. ¶ 1.) Based on the altercation between Robinson and Officer Fenner, Captain Hurlock placed Robinson on the security list ("TSL"). (*Id.* ¶ 2.) "TSL is a heightened security classification for inmates who have in part demonstrated acts of violence or [who] have violent tendencies." (*Id.* ¶ 3.) "Robinson was subjected to the same security protocols as

all the other inmates on TSL," including "the use of handcuffs, waist chain, and shackles" when being transported. (*Id.* ¶ 4.) "Robinson was allowed showers and recreation time 2–3 times a week, respectively." (*Id.* ¶ 7.)

The purpose of these protocols is "for the safety of the ADC staff and inmates." Captain Hurlock reviews the status of "inmates on TSL once or twice a week." (*Id.* ¶ 9.) Robinson remained on TSL from the date the altercation occurred, on August 30, 2017, until February 2018. (*Id.*) At that time, Robinson was removed from TSL because his court proceedings regarding the assault on Officer Fenner had concluded in January 2018, and Robinson "had been incident-free for 30 days." (*Id.*) Aside from the incident in question, Robinson had "no history of violent or aggressive behavior" while he was housed at the ADC. (Robinson Decl. ¶ 10.)

### III. Analysis

#### A.    Claim One (a)

Allegations of excessive force against a pretrial detainee must be evaluated under the Due Process Clause of the Fourteenth Amendment. *See Goodman v. Barber*, 539 F. App'x 87, 89 (4th Cir. 2013) (citation omitted). A detainee must show that the defendant "inflicted unnecessary and wanton pain and suffering upon the detainee." *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (citations omitted) (internal quotation marks omitted), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). A detainee may prevail by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (citations

8

omitted).[5] The factors that a court may consider to determine whether force was
objectively unreasonable may include:

> [1] the relationship between the need for the use of force and the amount of
> force used; [2] the extent of [the detainee's] injury; [3] any effort made by
> the officer to temper or to limit the amount of force; [4] the severity of the
> security problem at issue; [5] the threat reasonably perceived by the officer;
> and [6] whether the [detainee] was actively resisting.

*Id.* at 397 (third and eighth alterations in original) (citing *Graham v. Connor*, 490 U.S.
386, 396 (1989)).

"[O]fficers facing disturbances 'are often forced to make split-second
judgments.'" *Id.* at 399 (citing *Graham*, 490 U.S. at 397). Consequently, courts "must
judge the reasonableness of the force used from the perspective and with the knowledge
of the defendant officer." *Id.* (citation omitted) (internal quotation mark omitted). Courts
recognize that "agents of the state are permitted to exercise a certain degree of force in
order to protect the interests of society." *Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th
Cir. 2013) (quoting *Justice v. Dennis*, 834 F.2d 380, 382 (4th Cir. 1987), *vacated on
other grounds by* 490 U.S. 1087 (1989)). Thus, not every "push or shove, even if it may
later seem unnecessary" is serious enough to rise to the level of a constitutional violation.
*Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008) (quoting *Graham*, 490 U.S. at 396),
*abrogated on other grounds by Wilkins*, 559 U.S. 34.

As such, the Court "must accord due deference to an officer's efforts to restrain a
detainee when faced with a dynamic and potentially violent situation; otherwise, 'we

---

[5] In *Kingsley*, the Supreme Court determined that the appropriate standard is "only that the
officers' use of that force was *objectively* unreasonable," not that "the officers were *subjectively*
aware that their use of force was unreasonable." 576 U.S. at 391–92.

would give encouragement to insubordination in an environment which is already volatile enough.'" *Scarbro v. New Hanover Cty.*, 374 F. App'x 366, 370 (4th Cir. 2010) (quoting *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999)). In addition, the determination of whether an officer used excessive force must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397.

In this instance, Robinson has failed to show that Officer Fenner "inflicted unnecessary and wanton pain and suffering upon [him]." *Carr*, 453 F.3d at 605. Rather, as discussed below, the record demonstrates Robinson attacked Officer Fenner first and Officer Fenner used a limited amount of force to secure his safety. Indeed, applying the *Kingsley* factors to this record clearly establishes that Officer Fenner did not "assault" Robinson or use excessive force against him. *See* 576 U.S. at 397.

The first *Kingsley* factor requires the Court to examine "the relationship between the need for the use of force and the amount of force used." *Id.* Robinson "charged [Officer Fenner]," without provocation or warning, "and grabbed [him] by the shirt and tried to wrestle [him] to the ground." (Fenner Aff. ¶¶ 4–7; Second Fenner Aff. ¶ 3.) Officer Fenner was in a very dangerous position: isolated in a cell with Robinson and his cellmate. (Fenner Aff. ¶ 6.) Further, Officer Fenner was bent over and obviously off guard when Robinson struck. (*Id.* ¶ 7.) Alone in a cell, outnumbered by detainees, and surprised by a larger attacker, Officer Fenner's "need for the use of force" was obvious . and immediate. *See Kingsley*, 576 U.S. at 397.

10

Conversely, Officer Fenner's actual use of force was mild when considered in light of the extreme danger he faced. Officer Fenner first tried to "regain control of the situation" by "grabb[ing] Robinson around the waist." (*Id.* ¶ 7.) Robinson did not relent, however, and during the ensuing struggle, the two men "ended up in the back of the cell." (*Id.*) Robinson then escalated his violence by "swinging his fists at [Officer Fenner]." (*Id.* ¶ 8.) Officer Fenner "asked [Robinson] to stop," but Robinson refused. (*Id.* ¶¶ 8–9.) Officer Fenner then "grabbed [Robinson's] left arm [and] placed it into a 'bent wrist' behind his back and placed him against the wall." (*Id.*) Robinson "continued to resist [and] push[ed] himself off the wall." (*Id.*) It was only after Robinson's "forehead hit the wall" that Officer Fenner was able to handcuff Robinson. (*Id.*)

In this case, the "need for the use of force" was great, and the "amount of force used" was minor in light of the danger Officer Fenner faced. *See Kingsley*, 576 U.S. at 397. Even though Robinson attempted to strike him, Officer Fenner never struck Robinson, a physically larger man who had just ambushed him. (Fenner Aff. ¶¶ 7–8, 10, 14.) Instead, Officer Fenner only applied the minimal amount of force necessary to escape the situation. As such, the first *Kingsley* factor clearly cuts against Robinson's claim.

The second *Kingsley* factor requires the Court to examine "the extent of [the detainee's] injury." 576 U.S. at 397. Here, Robinson had only *very minor* redness and irritation on his forehead and arm following his attack on Officer Fenner. (*See, e.g.*, ECF No. 58-4 at 4–6.) Moreover, under these circumstances, Robinson's injuries could be readily attributed to his own violent acts and combative behavior, as opposed to anything

11

that Officer Fenner may have done. Consequently, this inquiry too counsels in favor of denying Robinson's claim.

The third *Kingsley* factor requires the court to consider "any effort made by the officer to temper or to limit the amount of force." 576 U.S. at 397. As discussed above, after Robinson attacked him, Officer Fenner's first reaction was to attempt to "regain control of the situation" by "grabb[ing] Robinson around the waist." (Fenner Aff. ¶ 7.) This was an understandable and measured reaction in light of the circumstances. However, this did not work, and Robinson escalated his violence. (*Id.* ¶ 8.) Even though, at this juncture, Officer Fenner would have been justified in striking Robinson— a larger man who had just ambushed him—he did not do so. Rather, Officer Fenner attempted to used verbal prompts to encourage Robinson to cease and desist, which also ultimately failed. (*Id.* ¶¶ 8–9.) Officer Fenner demonstrated a great deal of restraint by appyling appropriate, measured, and proportionately mild techniques to end the situation without further violence. Robinson simply did not cooperate with Officer Fenner's attempts to deescalate the situation. As such, the third *Kingsley* factor also suggests the denial of Robinson's claim.

The Court is next required to consider "the severity of the security problem at issue." 576 U.S. at 397. As discussed above, the severity of the security risk that Robinson presented cannot be underestimated. A surprise attack by a physically larger detainee upon a lone officer in a confined space out of view of other officers and in the presence of another detainee is a nightmare scenario for any corrections officer. It does not require a great deal of imagination to envision a very harrowing fate befalling such an

12

officer in such a situation. Plainly stated, Robinson deliberately placed Officer Fenner in an extremely dangerous position with the obvious intent of causing him harm. Consequently, the fourth *Kingsley* factor also counsels against Robinson's claim.

Similarly, the fifth *Kingsley* factor, which requires the Court to examine "the threat reasonably perceived by the officer," also suggests dismissal of Robinson's claim. *See* 576 U.S. at 397. As discussed above, Officer Fenner was alone in a cell, outnumbered by detainees, and surprised by an aggressive and physically larger attacker. Any officer in that position would have reasonably perceived the risk to both their personal safety and their life as grave.

The sixth and final *Kingsley* factor requires the Court to evaluate "whether the [detainee] was actively resisting." 576 U.S. at 397. As discussed above, Robinson clearly initiated the attack with the intent of causing harm to Officer Fenner and he did not relent in his pursuit until he was handcuffed. Despite Officer Fenner's verbal prompts and attempts to physically restrain him, Robinson remained combative throughout the entire encounter. As such, this consideration likewise guides the Court to deny Robinson's claim.

Overall, the uncontroverted evidence establishes that Officer Fenner did not "assault" Robinson or apply excessive force. Rather, Officer's Fenner's actions were rationally related to a legitimate government objective, protecting his own life and safety, and were not excessive for that purpose. *See Kingsley*, 576 U.S. at 398. Accordingly, Claim One (a) will be dismissed.

**B.    Claim Three (b)**

In Claim Three (b), Robinson alleges that Captain Hurlock subjected him cruel

and unusual punishment while on TSL. (ECF No. 39 at 2.)  Because Robinson was a

pretrial detainee at the time, the Court must analyze this claim under the Due Process

Clause of the Fourteenth Amendment.[6] *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979).

*Bell* teaches "that the proper inquiry" for this Court to consider "is whether th[e]

[challenged] conditions amount to punishment of the detainee." *Id.* at 535.  Captain

Hurlock argues that he did not "punish" Robinson. (ECF No. 58 at 8–9.)  Rather, he

contends that Robinson's placement on TSL was an "objectively reasonable" response to

a security concern, which was done "for the safety of ADC staff and inmates." (*Id.*)  In

the alternative, Captain Hurlock argues that qualified immunity shields him from liability

in this instance. (*Id.* at 9.)

---

[6] Detainees may bring distinct claims for substantive and procedural due process violations based on pretrial conditions. *Williamson v. Stirling*, 912 F.3d 154, 165, 173 (4th. Cir. 2018); *see also Ford v. Bender*, 768 F.3d 15, 23–27 (1st Cir. 2014). "The right to substantive due process implicates the essence of state action rather than its modalities." *Ford*, 768 F.3d at 23 (internal quotation marks and citation omitted). Substantive due process "protects individuals from state actions that are arbitrary and capricious, run counter to the concept of ordered liberty, or appear shocking or violative of universal standards of decency." *Id.* (internal quotation marks and citation omitted). "Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility." *Williamson*, 912 F.3d at 174 (citation omitted). However, actions taken against an individual can also provide fodder for a substantive due process claim. *See Robles v. Prince George's Cnty.*, 302 F.3d 262, 269 (4th Cir. 2002) (applying substantive due process analysis to maltreatment of a detainee during custody transfer). Procedural due process, on the other hand, represents "a guarantee of fair procedure." *Ford*, 768 F.3d at 24 (internal quotations and citation omitted.) This Court previously dismissed Robinson's procedural due process claim related to TSL without prejudice. (ECF No. 54 at 12–15; ECF No. 55 at 1.) The Court understands Claim Three (b) to allege purely a substantive due process violation. Thus, the ultimate issue is whether Captain Hurlock's decision to put Robinson on TSL was "arbitrary and capricious," whether it "[ran] counter to the concept of ordered liberty," or whether it was "shocking or violative of universal standards of decency." *Ford*, 768 F.3d at 23.

It is clear that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537. "Once the Government has exercised its . . . authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Id.* "Traditionally, this . . . results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial." *Id.* "Loss of freedom of choice and privacy are inherent incidents of confinement." *Id.* "[T]he fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible . . . does not convert the conditions or restrictions of detention into 'punishment.'" *Id.* "A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546.

The Supreme Court of the United States stated that the task of lower courts is to "decide whether the disability is imposed for the purpose of punishment *or whether it is but an incident of some other legitimate governmental purpose.*" *Id.* (citation omitted) (emphasis added). *Bell* says that "[a]bsent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* (citation omitted) (alternations in original). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. However, if a

15

restriction is "arbitrary or purposeless," then a court "may infer" that it is "punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539.

Bell unequivocally "recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *Id.* at 537 (citations omitted). In so doing, the Supreme Court rejected the contention that ensuring a detainee's presence at trial is the "*only* objective that may justify restraints and conditions once the decision is lawfully made to confine a person." *Id.* at 539–40. *Bell* specifically holds that there are "legitimate operational concerns," such as "tak[ing] steps to maintain security and order at the institution," that "may require administrative measures that go beyond those that are . . . necessary to ensure that a detainee shows up for trial." *Id.* Indeed, "maintaining institutional security and preserving internal order and discipline are *essential goals* that may require limitations or retraction of the retained constitutional rights of both convicted persons and pretrial detainees." *Id.* at 546 (emphasis added). To that end, *Bell* concluded that "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel . . . ." *Id.* at 547.

While *Bell* clearly recognized that "effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions . . . and dispel any inference that such restrictions are intended as punishment," the Supreme Court declined to "attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention." *Id. Bell* did not leave the issue entirely open, however, offering lower courts the following guidance:

16

> In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of *substantial evidence* in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment.

*Id.* at 540 n.23 (citations omitted) (internal quotation marks and alteration omitted) (emphasis added). But *Bell* also recognized that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." 441 U.S. at 547. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* Thus, in the wake of *Bell*, it is clear that where a restriction or practice is "actuated" based upon to a "genuine security consideration," any party seeking to challenge that restriction or practice will face a "*heavy burden* of showing that [jail] officials have exaggerated their response" to said security concern. *Id.* at 561–62 (emphasis added). It is against this backdrop that the Court must evaluate Claim Three (b).

The uncontroverted evidence establishes that immediately following Robinson's attack on Officer Fenner, Captain Hurlock placed Robinson on TSL. (Hurlock Aff. ¶ 2.) While TSL is undoubtedly a "heightened security classification" for detainees that have "demonstrated acts of violence or [who] have violent tendencies," (*id.* ¶ 3), TSL does not appear to include the harsher aspects of isolation or solitary confinement. Rather, the most stringent conditions that Robinson faced was "the use of handcuffs, [a] waist chain,

and shackles" when he was being transported and a reduction in the amount of time he was given to shower and participate in recreation. (*Id.* ¶¶ 4, 7).

On its face, the decision to place Robinson on TSL seems like a relatively mild restriction "actuated" in response to an attack on guard, which undeniably qualifies as a "genuine security consideration." *Bell*, 441 U.S. at 561–62. Simply put, whether Robinson had a history of violence or not, this one incident was sufficiently violent and serious to merit significant restrictions to ensure the safety of the ADC staff as well as Robinson himself. The use of shackles and handcuffs to transport Robinson was certainly a reasonable and proportionate way to deal with a man who had already attacked an unsuspecting guard.

Moreover, limiting Robinson's recreation and shower times to two to three times a week was not unreasonable under the circumstances because, each time that Robinson would have recreation or take a shower, he would need to be transported. This necessitated, as a result of his TSL status, the use of handcuffs and shackles, and, presumably, more manpower. In addition to placing Robinson in close contact with other officers, who were at an increased risk of being assaulted, frequent transports of Robinson would also place a burden on facility resources. Thus, limiting the number of transports reduced the potential for harm and conserved resources.

Finally, Robinson's tenure on TSL was limited. Captain Hurlock monitored his status regularly, and, when Robinson's related state court proceedings were concluded,[7]

---

[7] It is unclear in the record exactly why Captain Hurlock decided to include Robinson's state court proceedings as a factor in computing the duration of his time on TSL. It is also unclear whether other more punitive measures than TSL were available to Captain Hurlock in his

Captain Hurlock released Robinson from TSL after he demonstrated that he could be "incident-free" for thirty days—a meager requirement given the circumstances. Nothing about the actual conditions that Robinson was subjected to suggests that Captain Hurlock improperly "exaggerated [his] response" to the "genuine security consideration" that he was addressing. *See Bell*, 441 U.S. at 561–62.

Were this the end of the inquiry, the Court could easily conclude that Captain Hurlock's decision to put Robinson on TSL was a reasonable restriction "actuated" based upon a "genuine security consideration," and Robinson had clearly failed to carry his "*heavy burden* of showing that [Captain Hurlock] exaggerated [his] response" to said security concern. *See Bell*, 441 U.S. at 561–62 (emphasis added). However, there is one additional detail that the Court must consider. Robinson maintains that "Captain Hurlock told [Robinson] on numerous occasions that [Captain Hurlock] wouldn't let [Robinson] off of 'TSL' due to [Robinson's] violent behavior and that [Robinson] being on TSL is *punishment* for assaulting [Captain Hurlock's] officer." (Robinson Decl. ¶ 11 (emphasis added).) Accepting Robinson's statement as true, as the Court must do at this stage in the proceedings, the attribution of this statement to Captain Hurlock raises further legal questions.

According to Robinson's own statement, Captain Hurlock's primary reason for keeping him on the TSL seems to be Robinson's own "violent behavior." This is a

---

dealings with Robinson. To the extent that Captain Hurlock was waiting to see what the state court might do before he determined whether to impose further restraints on Robinson, such a position would seem to be measured and reasonable under the circumstances. However, as the record lack clarity on these points, the Court will not speculate as to Captain Hurlock's rationale.

legitimate consideration by any measure. However, notwithstanding the fact that Captain Hurlock's actions seem to have been measured and reasonable, given the circumstances, and there appears to be an independent and justifiable motivation for said actions, the mere fact that Captain Hurlock may have uttered the word "punishment" to describe the restrictions placed on Robinson arguably evidences an "express intent to punish" under *Bell*, at least to some extent. The consequences of this statement, however, are not completely clear.

*Bell* does not specify what exactly a reviewing court should do if it finds that an "express intent to punish" existed, or detail exactly what the consequences of such a finding might be. The only thing *Bell* directly tells lower courts is what to do "[a]bsent a showing of an expressed intent to punish." 441 U.S. at 546; *see also Ford v. Bender*, 768 F.3d 15, 24 (1st Cir. 2014) ("While *Bell* provides clear guidance about the constitutional bounds of conditions of confinement for pretrial detainees, *Bell* does not clearly address whether and when punishment is permitted as an individualized disciplinary sanction for a pretrial detainee's misconduct."). The Court of Appeals for the Fourth Circuit traditionally has applied *Bell* to mean that, "to prevail on a substantive due process claim, the pretrial detainee must show that a particular restriction was either: (1) imposed with an express intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective." *Williamson*, 912 F.3d at 175 (internal quotation marks omitted) (quoting *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 251 (4th Cir. 2005)). However, the Fourth Circuit recognized that "jail officials are entitled to discipline pretrial detainees for infractions committed in custody and to impose restrictions for

20

administrative purposes without running afoul of *Bell*." *Id.* (citations omitted).  In this regard, "disciplinary measures based on a pretrial detainee's misconduct in custody and proportional thereto are not 'punishment' within the meaning of *Bell* and therefore are not unconstitutional." *Id.* at 176 n.18 (citations omitted).  "The key difference between permissible 'disciplinary' restrictions and unconstitutional 'punishment' is that the former are intended to advance—and are reasonably related to—'the effective management of the detention facility.'" *Id.* (quoting *Bell*, 441 U.S. at 540.)  It is only when "such measures are excessive or arbitrary," that "they may constitute prohibited punishment." *Id.* (citations omitted).

Although "proportional restrictions imposed on a pretrial detainee for a permissible purpose can trigger [procedural] due process protections pursuant to *Bell* and the Due Process Clause," *id.* at 175 (citing *Dilworth v. Adams*, 841 F.3d 246, 252 (4th Cir. 2016)), they are nevertheless, still "not 'punishment' within the meaning of *Bell*," *id.* at 176 n.18 (citing *Bell*, 441 U.S. at 540), unless they become "so disproportionate, gratuitous, or arbitrary that [they] become[] a categorically prohibited punishment that will sustain a substantive due process claim," *id.* at 175.  Put another way, "although jail officials are entitled to impose discipline and promote internal security by placing restrictions on pretrial detainees, such measures must yet be rationally related to a legitimate governmental purpose, regardless of the procedural protections provided." *Id.* at 176 (citations omitted).

As discussed above, Captain Hurlock's actions on their face were a seemingly reasonable and proportionate response to an institutional infraction.  There was nothing

"excessive or arbitrary" about them, and, by Robinson's own account, the primary

motivation for the restrictions was Robinson's "violent behavior." Thus, if Captain

Hurlock had used the word "discipline," a synonym for punishment,[8] to describe the

restrictions that he placed on Robinson, in place of the word "punishment," then,

according to *Williamson*, he would not have "run[] afoul of *Bell*." *Id.* at 175, 176 n.18;

*see also J.H. v. Williamson Co.*, 951 F.3d 709, 717 (6th Cir. 2020) (citation omitted)

(observing that the "express intent" prong of *Bell* does not "categorically prohibit

discipline imposed by jail officials for infractions committed while in pretrial detention").

*But cf. Dilworth*, 841 F.3d at 252 (analyzing a procedural due process claim and finding

that express intent to punish was "manifestly clear" where "disciplinary action" was

taken based on an "Inmate Disciplinary Report"). Thus, if literally applied in a rote

fashion, form might reign over substance, and, at least in this instance, a government

official's choice of words might arguably matter more than either the intent behind those

words or the corresponding actions that accompany them.

Other courts, however, have rejected such arguments as being "built on

semantics." *Collazo–Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 317 (1st Cir. 1995).

In that case, the Court of Appeals for First Circuit found that there was no "meaningful

distinction between the terms 'punishment' and 'discipline.'" *Id.* Rather, the court found

that "reasonable punishment may be imposed to *enforce* reasonable prison disciplinary

requirements but may not be imposed to sanction prior unproven criminal conduct." *Id.*

---

[8] *Punishment*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/punishment
(last visited February 26, 2021) (including "discipline as a synonym for the word "punishment").

22

at 318 (vacating district court finding of express intent to punish); *see also Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999) (emphasis added) ("[A] pretrial detainee can be *punished* for misconduct that occurs while he is awaiting trial in a pretrial confinement status.").[9] This is so because "the basis for this punishment is not the underlying crime of which [the detainee] stands accused; rather this punishment is based upon the detainee's actions while in pretrial confinement." *Id.* (citing *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996); *Collazo–Leon*, 51 F.3d at 318).

The legal tests applied in *Williamson, JH, Rapier*, and *Collazo–Leon* are not that vastly different. Each case is generally consistent with the teachings of *Bell* in that they all allow for reasonable restrictions to be placed on detainees who violate institutional rules related to security and order, provided that the restrictions are not excessive. The remaining question is whether the analysis of an otherwise reasonable and constitutional restriction clearly motivated by a detainee's "violent behavior" is altered by a hair-splitting distinction between two words that essentially mean the same thing. *See Punishment*, MERRIAM-WEBSTER, *supra* note 8. The First and Seventh Circuits appear to have answered that question in the negative. *Collazo–Leon*, 51 F.3d at 317; *Rapier*, 172 F.3d at 1003. Moreover, after surveying the case law, the Court cannot find an instance where the Fourth Circuit has addressed this specific question or found that an "expressed intent" to punish existed in the context of a substantive due process claim.

---

[9] The Fourth Circuit cited *Rapier* favorably for various propositions in both *Dilworth* and *Williamson. See Dilworth*, 841 F.3d at 252; *Williamson*, 912 F.3d at 181 n.20, 182 n.21, 185, 188.

The Court recognizes that in *Dilworth*, the Fourth Circuit found an "expressed intent to punish" where jail officials took "disciplinary action[]" against a detainee based upon an "Inmate Disciplinary Report." 841 F.3d at 252. However, *Dilworth* did not address a substantive due process claim. Rather, *Dilworth* examined whether procedural due process was provided. *Id.* at 248 ("Dilworth sued . . . arguing that the imposition of disciplinary segregation . . . violated his procedural due process rights."). Further, *Williamson* makes clear that "proportional restrictions imposed on a pretrial detainee for a permissible purpose can trigger [procedural] due process protections pursuant to *Bell* and the Due Process Clause," 912 F.3d at 175 (citing *Dilworth*, 841 F.3d at 252), without necessarily becoming "punishment within the meaning of *Bell*," *id.* at 176 n.18 (internal quotation marks omitted) (citing *Bell*, 441 U.S. at 540). Indeed, under the plain language of *Williamson*, in the context of a substantive due process analysis, the "disciplinary action[]" taken in *Dilworth* would not have constituted "punishment" under *Bell*, so long as it was "proportional" to the misconduct being addressed.[10] *Id.* (citations omitted).

Based on the record before it, the Court finds that Robinson has failed to carry his "*heavy burden* of showing that [Captain Hurlock] . . . exaggerated [his] response" to a "genuine security consideration," despite the statements that Robinson attributes to him. *See Bell*, 441 U.S. at 561–62 (emphasis added). Captain Hurlock's decision to place Robinson on TSL was a mild response to serious intuitional infraction. TSL was not "imposed for the purpose of punishment." *See id.* at 546. Rather, the clear motivation

---

[10] The Fourth Circuit did not address this point in *Dilworth* because it was not necessary to the procedural due process claim before it.

for the action was Robinson's violent behavior. As such, Robinson's placement on TSL was clearly "but an incident of some other legitimate governmental purpose," namely, the maintenance of security and order at the ADC. *See id.* (citation omitted). Under these circumstances, no reasonable fact finder could determine that Captain Hurlock violated Robinson's substantive due process rights.[11] Thus, Claim Three (b) will be dismissed.

## IV. Conclusion

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 57) will be granted. Claims One (a) and Three (b) will be dismissed. Robinson's Motions for the Appointment of Counsel (ECF Nos. 56, 60) will be denied. The action will be dismissed.

An appropriate Order will accompany this Memorandum Opinion.

/s/

HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: Feb. 26, 2021
Richmond, Virginia

---

[11] Nothing about Captain Hurlock's actions were "so disproportionate, gratuitous, or arbitrary that it [became] a categorically prohibited punishment that w[ould] sustain a substantive due process claim." *See Williamson*, 912 F.3d at 175; *see also Ford*, 768 F.3d at 23 (observing that substantive due process protects against "state actions that are arbitrary and capricious, run counter to the concept of ordered liberty, or appear shocking or violative of universal standards of decency").